# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
April 4, 2004 Session

## LAURIE ANN SEARCY v. SANDY LEE SEARCY

Appeal from the Chancery Court for Robertson County
No. 14267     Carol A. Catalano, Chancellor

No. M2003-00036-COA-R3-CV- **Filed December 13, 2004**

Laurie Ann Searcy sought, by post-divorce Petition, a modification of the child custody and visitation privileges provided by the divorce decree.  The trial court held that no change of circumstances had occurred "with a negative impact upon the child" and denied modification.  We hold that the trial court applied an improper standard for determining the change of circumstances issue.  We hold, however, that no change of circumstances has occurred under *Cranston v. Combs*, 106 S.W.3d 641 (Tenn. 2003) and Tennessee Code Annotated section 36-6-101(a)(2)(B) and affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, and FRANK G. CLEMENT, JR., JJ., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Laurie Ann Searcy.

Charlotte U. Fleming, Wende J. Rutherford, and Regina Mathias Farmer, Springfield, Tennessee, for the appellee, Sandy Lee Searcy.

### OPINION

The controlling issue on appeal in this case is a determination of whether or not a change of circumstances has occurred since the parties' divorce decree that would warrant a modification of the child custody and visitation provisions incorporated in the Final Decree of Divorce.

While this modification of custody and visitation Petition was making its way through the trial court, the standard to be applied in determining whether or not a change of circumstances had occurred was undergoing both a common law and a statutory metamorphosis, as *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002), *Cranston v. Combs*, 106 S.W.3d 641 (Tenn. 2003), and the legislative enactment of Chapter 859 of the Public Acts of 2002 were running essentially

simultaneous and parallel courses with the trial court proceedings in this case. The trial court applied a variation of the "substantial risk of harm" standard in its November 20, 2002 dismissal of this Petition for modification. We will discuss the metamorphosis of the rule at the outset.

Appellate decisions in recent years reflect much controversy as to what "change of circumstances" means in the context of a petition to modify an existing custody order. While there has never been any question but that the burden of proof in such a proceeding rests upon the non-custodial parent to prove that a change in circumstances has occurred, the controversy centers around what one must prove in order to establish a change of circumstances. In *Dailey v. Dailey*, 635 S.W.2d 391, 393 (Tenn.Ct.App. 1981) this Court observed:

> We agree that it is a well-settled principle in this jurisdiction that where an award of custody of a minor is made which has no restrictions or limitations it will support a plea of *res judicata* and to justify a petition for a change in custody there must have been such a change in circumstances as will directly affect the welfare of the minor.

In 1991, however, this Court held:

> The paramount consideration in a custody proceeding is the best interest of the child. When the issue before the Court is whether to modify a prior custody order, it need not repeat the comparative fitness analysis that is appropriate at the time of the original custody degree. *See e.g., Bah v. Bah*, 668 S.W.2d 663 (Tenn.App. 1983). Instead, in a modification proceeding, the trial judge must find a material change in circumstances that is compelling enough to warrant the dramatic remedy of changed custody. *See*, Tenn. Code Ann. § 36-6-101(a); *Woodard v. Woodard*, 783 S.W.2d 188 (Tenn.App. 1989); *Dailey v. Dailey*, 635 S.W.2d 391 (Tenn.App. 1981). Moreover, the burden is on the non-custodial parent to prove changed circumstances.

*Musselman v. Acuff*, 826 S.W.2d 920, 922 (Tenn.Ct.App. 1991).

Thereafter, in a number of cases, this Court has followed the lead of *Musselman v. Acuff* in establishing that change of circumstances requires proof that such a change is necessary to prevent substantial harm to the child.

> In order to be compelling enough to warrant the dramatic remedy of changed custody, the change of circumstances must be such that "continuation of the adjudicated custody will substantially harm the child." *Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn.App. 1995). When the requested modification is based on the behavior of the custodial parent, such behavior must clearly posit or cause danger to the mental or emotional well-being of the child. *Musselman v. Acuff*, at 924. We also are mindful that custody decisions should not be designed to punish one parent or to reward the other. *Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn.App. 1995).

Instead, our paramount concern remains the welfare and best interest of the minor child. *In re Parsons*, 914 S.W.2d 889, 893 (Tenn.App. 1995).

> This court has discussed "changed circumstances" as follows:
>> This decision [regarding custody] is not changeable except for "change of circumstances" which is defined as that which requires a change to prevent substantial harm to the child. Custody is not changed for the welfare or pleasure of either parent or to punish either parent, but to preserve the welfare of the child. Custody is not changed because one parent is able to furnish a more commodious or pleasant environment than the other, but where continuation of the adjudicated custody will substantially harm the child.

> *Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn.App. 1995).

*Thomson v. Thomson*, No. 03A01-9809-CH-00308, 1999 WL 894446, at *8 (Tenn.Ct.App. Oct. 18, 1999).

This same analysis was applied by this Court in *Brown v. Brown*, No. 02A01-9709-CV-00228, 1998 WL 760935, at *8 (Tenn.Ct.App. Nov. 2, 1998). This court said: "In the absence of any competent testimony that a continuation of the current custody arrangement presents a danger of substantial harm to Chandler, we decline to disturb the trial court's decision to deny a change of custody." Thereafter, the Court said in footnote:

> The principle enunciated in *Wall v. Wall, supra*, is not at odds with the traditional "best interests" test. Ping-pong custody adjudications are not in a child's best interests. This problem has been addressed with unanimity by *Aaby, Musselman*, and *Contreras*, as well as by *Wall*. *Aaby*, a parental relocation case, specifically held that "Tennessee allows custody to be changed if the behavior of the custodial parent *clearly posits a danger* to the physical, mental or emotional well-being of the child [citation omitted]." [Emphasis supplied]. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1966). *Musselman*, citing *Ballard v. Ballard*, 434 So.2d 1357, 1360 (Miss. 1983), held: "It is only that behavior of a parent which *clearly posits or causes danger* to the mental or emotional well-being of a child . . . which is sufficient basis to seriously consider the drastic legal action of changing custody." [Emphasis supplied]. *Musselman v. Acuff*, 826 S.W.2d 920, 924 (Tenn.App. 1991). *Contreras*, quoting *Sartoph v. Sartoph*, 31 Md.App. 58, 354 A.2d 467, 473 (Md.App. 1976), stated: "The custody of children should not be disturbed unless there is some strong reason *affecting the welfare of the child*. To justify a change in custody, the change in conditions *must have occurred* which affects the welfare of the child and *not that of the parents*." [Emphasis supplied]. *Contreras v. Ward*, 831 S.W.2d 288, 290 (Tenn.App. 1991). These cases are all in accord with the language of *Wall v. Wall, supra*, that, once a valid custody determination is made, such custody is not

subject to change unless there is a "change of circumstances . . . which requires a change to prevent substantial harm to the child." *Wall v. Wall*, 907 S.W.2d 829, 834 (Tenn.App. 1995). "In short, when all goes well with children, stability, not change, is in their best interests." *Contreras v. Ward, supra*, citing *Sartoph v. Sartoph*.

*Brown*, 1998 WL 760935, at *8 n.3.

In *Richardson v. Richardson*, No. W2000-02374-COA-R3-CV, 2001 WL 687074, (Tenn.Ct.App. June 14, 2001), the Western Section of this Court again followed the *Musselman* and *Wall* rule relative to substantial harm to the child. In a prophetic concurring opinion, Judge Farmer questioned the continued viability of the *Musselman-Wall* standard asserting that: "I am concerned that we have created too harsh a standard by holding that a change of custody will be granted *only* upon a showing that a continuation of the adjudicated custody will *substantially harm* the child." *Richardson*, 2001 WL 687074, at *7 (Farmer, J., concurring).

In 2002, the supreme court, in *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002), in the context of a custody case between a parent and a non-parent, observed: "[A] trial court should apply the standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interests." *Blair*, 77 S.W.3d at 148.

Later in 2002, the supreme court expanded upon its *Blair* observation in *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002), holding:

> The principal issue in this case concerns the proper standard to be applied to a petition to modify custody from one parent to the other parent. This issue is largely resolved by our recent decision in *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn. 2002). *Blair* involved a custody dispute between a parent and a non-parent. We concluded that once a valid order of custody has been issued, subsequent custody modification proceedings should apply the "standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interests." *Id.* at 148. As explained in *Blair*, the "threshold issue" is whether a material change in circumstances has occurred after the initial custody determination. *Id.* at 150. While "[t]here are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody," the following factors have formed a sound basis for determining whether a material change in circumstances has occurred: the change "has occurred after the entry of the order sought to be modified," the change "is not one that was known or reasonably anticipated when the order was entered," and the change "is one that affects the child's well-being in a meaningful way." *Id.* (citations omitted). We note that a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well-being.

*Kendrick*, 90 S.W.3d at 570.

Finally, in 2003, the supreme court laid to rest any lingering doubt about the demise of the *Musselman-Wall* rule. Said the court:

> We granted review to determine whether the Court of Appeals erred in determining that the appellant (father) in this post-divorce case failed to present evidence of a material change of circumstances justifying a change of custody of the parties' two minor children. The Chancellor granted a change in custody from the appellee (mother) after finding that there was a material change in circumstances that presented a substantial risk of harm to the children. A majority of the Court of Appeals reversed, holding that there was no material change of circumstances that presented a threat of substantial harm to the children. After reviewing the record and applying our recent decision in *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002), we conclude that a material change of circumstances occurred after the initial custody determination and that the modification of custody was in the best interest of the children. Although the Chancellor and the Court of Appeals did not have the benefit of *Kendrick* in this case, and therefore applied an incorrect legal standard, we affirm the result reached by the Chancery Court. Accordingly, the judgment of the Court of Appeals is reversed, and the judgment of the Chancery Court is reinstated.
>
> . . . .
>
> A majority of the Court of Appeals reversed the Chancery Court's change of custody ruling, concluding that Cranston and Combs "bickering" over visitation did not constitute a material change of circumstances that presented a threat of substantial harm to the children. Indeed, the majority determined that Combs failed to present evidence "rising to the level of substantial harm" to his son and "no actual evidence of any harm at all" to his daughter. The majority therefore concluded that it was unnecessary to apply a comparative fitness analysis. Special Judge Ash dissented, concluding that the Chancery Court properly found that a material change in circumstances existed and properly applied the comparative fitness analysis.

*Cranston*, 106 S.W.3d at 642, 643.

So it was that, in *Cranston v. Combs*, the controlling issue was placed directly before the supreme court contrasting the *Musselman-Wall* rule, as relied on by the majority of this Court, with the less stringent rule asserted in dissent by Special Judge Don Ash.

The supreme court left little doubt as to the controlling rule relative to "change of circumstances".

-5-

The appellant, Combs, argues that a finding of "harm" is not a prerequisite to changing an initial custody determination under Tennessee law. The appellant also argues that even if a finding of "harm" is required, the Chancery Court's custody determination should be reinstated because it found a "substantial risk of harm" and concluded that a change of custody was in the best interests of the children.

The appellee, Cranston, argues that the trial court must find "harm" before engaging in a comparative fitness analysis for the purpose of a change in custody determination. The appellee asserts that the Court of Appeals' majority correctly determined that there had been no evidence of a material change in circumstances creating a risk of harm to the children and reversed the Chancery Court's ruling.

Our recent decision in *Kendrick v. Shoemake*, 90 S.W.3d 566 (Tenn. 2002), resolves the issues before this Court. We held in *Kendrick* that the modification of a valid order of custody must be based on the " 'standard typically applied in parent-vs-parent modification cases: that a material change in circumstances has occurred, which makes a change in custody in the child's best interests.' " *Id*. at 570 (quoting *Blair v. Badenhope*, 77 S.W.3d 137, 148 (Tenn. 2002)).

We clarified that this standard requires the trial court to engage in a two-step process to make its final custody determination. First, the court must determine whether a material change in circumstances has occurred after the initial custody determination. Although there are no bright-line rules for determining when such a change has occurred, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way. *Kendrick*, 90 S.W.3d at 570; *see also Blair*, 77 S.W.3d at 150.

Second, after finding that a material change in circumstances has occurred, the trial court must determine whether modification of custody is in the child's best interests using the factors enumerated in Tennessee Code Annotated section 36-6-106 (2001).

*Cranston*, 106 S.W.3d at 643-44.

Running a parallel course to the events in *Kendrick, Cranston*, and the case at bar was a legislative initiative that culminated in the enactment of Chapter 859 of the Public Acts of 2002 effective as of July 15, 2002. This Act was not effective as of the June 26, 2002 hearing in the case at bar. It was, however, effective prior to the dispositive Order of the trial court of November 20, 2002.

*Kendrick* and *Cranston* both acknowledged this legislative act, which was codified as Tennessee Code Annotated section 36-6-101(a)(2)(B). In footnote, it is observed in *Cranston*:

As the parties have noted, the legislature has enacted Tennessee Code Annotated section 36-6-101(a)(2)(B) (2001 & Supp. 2002), which provides:

-6-

> If the issue before the court is a modification of the court's prior
> decree pertaining to custody or a residential parenting arrangement,
> the petitioner must prove by a preponderance of the evidence a
> material change in circumstance. *A material change of circumstance
> does not require a showing of a substantial risk of harm to the child.*
> A material change of circumstance may include, but is not limited to,
> failures to adhere to the parenting plan or circumstances which make
> the parenting plan no longer in the best interest of the child.

(Emphasis added). Although the statute did not become effective until July 15, 2002, *i.e.*, after the proceedings in this case, it reflects that the legislature has likewise clarified that a substantial risk of harm to a child is not required to find a material change in circumstances for the purpose of modifying a custody decree. *See Kendrick*, 90 S.W.3d at 570 n. 5 (discussing the enactment of Tenn. Code Ann. § 36-6-101(a)(2)(B)).

*Cranston*, 106 S.W.3d at 644 n.1.

Thus, both by common law development and by legislative enactment, *Musselman v. Acuff, Wall v. Wall*, and all of their respective progeny as to this issue have been overruled.

Laurie Ann Searcy and Sandy Lee Searcy married on March 27, 1993, and their only child, V., was born October 17, 1995. On November 12, 1998, Mother filed a Complaint for Divorce against Father, and the parties agreed that, pre-divorce, Mother would act as primary custodian with Father having visitation privileges.

Problems began in early April of 1999, which can best be described in the findings of fact made by the trial court following the hearing held June 24, 1999 on an Emergency Motion to Transfer Primary Physical Custody to Father and for Supervised Visitation filed by Father. Said the court:

1. The parties[] to this action were married on March 27, 1993. One child has been born of this marriage; namely, [V.M.S.], date of birth: 10/17/95.
2. The Mother filed for divorce on November 12, 1998.
3. On February 11, 1999, the parties entered into an Agreed Order for joint custody granting primary physical possession of the child to the Mother, with Father having visitation privileges, including overnight visitation. Said Agreed Order was signed by this Court and entered on March 26, 1999.
4. Thereafter, Mother maintains through communications with various entities that on April 7, 1999, the child's vagina was red and irritated. On April 8, 1999, the Mother took the child to Dr. Sparks, who conducted a gynecological examination resulting in findings of no redness or irritation of the minor child. Further, on April 12, 1999, the Mother made a referral to DCS alleging that the child had been subjected to sexual abuse, suggesting

the Father may be the perpetrator. On June 11, 1999, the Mother made another allegation of child sexual abuse against the Father and took the child to Dr. Roark, who conducted another gynecological examination and found no evidence of trauma.

5. During the course of the Mother's complaints of sexual abuse, the Mother provided the Robertson County Department of Children's Services (hereafter "DCS") and the Springfield Police Department with audio and video tapes made by the Mother and the child's maternal grandmother, Patsy Fletcher, which included leading and suggestive questions direct[ed] by the Mother and the maternal grandmother to the child with how the child should answer their questions as far as tapes are concerned.

6. Chris Bible, a DCS investigator, interviewed the minor child on May 24, 1999, and was unable to obtain any disclosures by the child, but did receive certain photographs of the child's genitals made by the Mother and the maternal grandmother.

7. Chris Bible and Officer Jo Ann Gregory, a sexual abuse investigator with the Springfield Police Department, observed that the Mother was concerned at the onset of the department's investigations, but over the course of the investigations, became hard to deal with, irate, violent, and uncooperative, even in the presence of the child.

8. Officer Jo Ann Gregory also testified that the Mother admitted to her that after each visitation period between the child and the Father, the Mother would examine the minor child['s] vagina for signs of sexual abuse.

9. After numerous gynecological examinations conducted on the minor child by various physicians, and even by the Mother with the participation of the maternal grandmother, there has been no confirmation of trauma to the child's genital area.

10. The complaints of child sexual abuse against the Father are unfounded, pursuant to the investigations by the Springfield Police Department and DCS; however, said departments are concerned about what the Mother is doing to this child.

11. The Mother did not appear at this emergency hearing, despite her being duly noticed.

12. As a result of the Mother's actions, the minor child now fears that the "police are going to take her mother away."

13. In addition, the Mother has called the Father a "child molester" in the presence of the child.

14. The Court has determined by this clear and convincing evidence that some psychological and/or emotional harm is already being experienced by this minor child as a result of the irrational conduct and intrusive behavior of the Mother.

15.     The Court finds that the Father was cooperative with the investigations of the Springfield Police Department and DCS, while maintaining rational behavior throughout, and is no longer under any investigation.

16.     The Mother, however, has maintained irrational behavior, even through the date of this hearing by her non-appearance at this emergency hearing.

Based upon these findings of fact, the trial court awarded Father custody of the child with a provision "[t]hat the Mother is awarded supervised visitation of the minor child only during periods when the Father is at work and with a third party continuously present, said third party being a person mutually agreeable between the parties."

Fourteen months later another hearing was held on August 10, 2000, on an Emergency Motion to Suspend Visitation Between the Wife and Minor Child, or in the Alternative, Strictly Limit Visitation Between the Wife and Minor Child, which motion was filed by Father. After this hearing, an Order was filed October 4, 2000, which provided, in part: "Attached hereto as Exhibit "A" and incorporated herein is an excerpt from the transcript of the Court's Ruling as a result of the August 10, 2000 hearing (the transcript bearing the date of August 8, 2000; however, the correct date of the hearing on the reference Motion is August 10, 2000)." This excerpt, entered as a part of the court's Order of October 4, 2000, provides in pertinent part, as follows:

On June 24th, 1999, there was an emergency motion for the Court to determine the custody of this child. An Order was tendered as a result of that hearing, June 25th, 1999. The Order reflected in various parts that Laurie Ann Searcy is the mother of this child, [V.M.S.], and that Sandy Lee Searcy is the father. That the birthday of this child is October 17th, 1995. This Order is being entered June 25th, 1999; the child is not yet four years old - - three years old. The child is three years old.

The Order reflects the finding of the fact that the mother files the divorce on November 12th, 1998. That on February 11th, 1999, the parties entered into an Agreed Order for joint custody granting primary physical possession of the child to the mother; the father, having visitation privileges, including overnight visitation. This Agreed Order between the parties was entered on the records of the Court March 26th, 1999.

Thereafter, the mother maintains that on April 7th, 1999, the child's vagina was red and irritated.

On April 8th, 1999, the mother took the child to Dr. Sparks who conducted a gynecological examination and made a finding that there was no redness or irritation.

On April 12th, 1999 - - Remember, this is a three-year-old child at this point. - - the mother made a referral to Department of Children's Services alleging the child had been subjected to sexual abuse, suggesting the father may be the perpetrator.

On June 11th, 1999, the mother made another allegation of child sexual abuse against the father and took the child to a Dr. Roark. Another gynecological examination was made. Dr. Roark found no evidence of trauma.

The mother provided the Robertson County Department of Children's Services and the Springfield Police Department with audio and videotapes made by the mother and the child's maternal grandmother, Patsy Fletcher. Tapes which included leading and suggestive questions directed by the mother and the maternal grandmother to the child with how the child should answer their questions. A Department of Children's Services investigator interviewed the child May 24th, 1999. Three-year-old child. The investigator was unable to obtain any disclosures by the child but did receive certain photographs of the child's genitals made by the mother and the maternal grandmother. Chris Bible, an investigator for the Department of Children's Services, and Officer Joanne Gregory observed that the mother was concerned at the onset, but over the course of the investigations, became hard to deal with; irate, violent, and uncooperative, even in the presence of the child.

The mother admitted to Officer Gregory that after each visitation period between the child and the father, the mother would examine the minor child's vagina for signs of sexual abuse. After numerous gynecological examinations conducted on the minor child by various physicians and by the mother, with the participation of the maternal grandmother, there has been no trauma of - - to the child's genital area. The complaints of sexual abuse against the father were unfounded as determined by the Springfield Police Department and the Department of Children's Services. The Departments are concerned about what the mother is doing to this child. The Court has determined that some psychological and/or emotional harm is already being experienced by this minor child as a result of the irrational conduct and intrusive behavior of the mother. The mother has maintained irrational behaviors. With that finding, the Court awarded custody of this minor child to her father and granted the mother supervised visitation.

Today, I'm going to refer you to the testimony of the supervisors. Now, remember, supervisors were not required until this Order of June 25th, 1999 was entered. Still, the child's only three years old. Those who have supervised the child since that Order was entered told us today - - first, Ms. Beauchane. At the time when Ms. Beauchane, the mother, the private investigator, and the grandmother, and the grandfather, who just testified, were at the house, after hearing the private investigator say there was not enough evidence to prove anything against the father to prevent him from taking the child to Florida, the mother said, He is not taking the child to Florida. The mother went and packed a bag, got the child, and started walking towards the woods. Her father, Mr. Fletcher, went after her. Ms. Beauchane said to Pat Fletcher, the maternal grandmother, Is she trying to leave? The maternal grandmother responded, Yeah, but he'll get her back. And then the statement was made, I've got a court date, you can't do this, as they were trying to encourage the mother not to leave with this child.

June 24th, 1999, the Court found that the mother has demonstrated irrational behavior for conduct prior to June 24th, 1999. Today, August 10th, 2000, the Court finds that the mother is still demonstrating irrational behavior for conduct in May - - or June of 2000. Nothing has changed.

When Mr. Searcy, the father, was given custody of the child, all of the things the mother had been doing were the reasons for Mr. Searcy being granted the custody of the child. What has the mother done since? Again, according to Ms. Beauchane, she has observed the mother taking pictures of the child's genitals. She, personally - - though, she wasn't the regular supervisor - - was requested to look on four different occasions herself. She specifically recalls that Patsy Fletcher, the maternal grandmother, was present on one occasion. And her own mother was present. Her own mother. Ms. Beauchane's own mother was present on other occasions. The mother is still taking pictures of this child's genital areas.

Now it's not just her and the maternal grandmother; now it's the supervisors or anyone else who happens to be in the household. Nothing has changed. That this child is asked to pose for pictures of her genitals, to turn around and bend over, and do this and do that, so we can get pictures of your genitals.

And Ms. Beauchane is asked, Have you seen the child pull at her genitals, touch her genitals, scratch herself? Why, yes. Well, why not? It seems to be the main topic of conversation at her grandfather's house. It's what everyone's interested in. We play and take pictures, he said. Yes, indeed you do. I've never seen a child brought up to see that taking pictures of her genitals was play, though.

Ms. Beauchane testified that especially Patsy Fletcher would say to the child, What did daddy do to you with this candle? And that on one occasion, Ms. Fletcher handed the candle to her, Ms. Beauchane, but she wouldn't take it. So Patsy Fletcher handed the candle to the child. I'm a lawyer not a child psychologist, but I think it would be a real good question to say to a child psychologist, If a child were abused with a candle, would you take a candle and hand it to them? It would be like if you're stabbing a child with a knife [Court motions], and they're getting all bloody, you going to bloody the knife and hand it to the child? If they've been abused with it? I mean, if they truly believed that was happening, would they do that? This is the instrument of your harm to your private area, put it in your hands. I would think that if it's truly happening, I would think the child would be horrified and scream and run and cry. I wouldn't do it. But I'm a lawyer. Maybe that's not the right approach. Maybe the child has been beaten with something, you hand them that? Look, here, this baseball bat's not that bad. I don't know. But they did it. Ms. Beauchane said, Patsy Fletcher did it. The mother's there, and she's there, and the child takes the candle and is not bothered one bit. I wouldn't have risked it if she was really abused. I think that could have done a lot of psychological damage, but they did do it, and the child held it without being bothered one bit.

After a discussion about whether or not it was even believable that the father was sexually abusing the child and so many third parties did not find it believable, Ms. Beauchane said the child began to be questioned about the father:

What did he feed you for supper? Where did you spend the night? Who was there? Who watched you? Who is he dating? Who does he talk to? Who was on vacation with you? At least the child's not being talked to about sexual abuse. But to be grilled about her father's activities, instead of enjoyed. She's now four years old. Was [that] not the point of the visitation the Court awarded the mother. It was not. It was really to strengthen the mother-daughter relationship. The mother used it to focus on the father-daughter relationship. She totally missed the point.

Ms. Kathy Warden, confirms this conduct. Ms. Kathy Warden was apparently a sitter for a longer period of time. Ms. Kathy Warden puts the abuse of this child in a much more clear perspective when she says, the mother questioned this child every day as soon as the child was put into the car. The mother began with what was happening to the child. The tape recorder was turned on. The child knew the tape recorder was on. That, too, didn't bother her. And the mother would even turn the air conditioner off if the car was stopped like in the driveway, or waiting to pick her up, or whenever they got her home, or even at McDonald's, so they could be sure to get every word about the alleged abuse the child was sharing with them.

And pictures and videotapes, Mrs. Searcy, the mother of this child, only had visitation privileges three days in the week. According to Ms. Warden, in three days, two or three rolls of film are taken of this child. Not all, obviously, of her genitals. But this child hasn't had an unrecorded moment, it doesn't appear to the Court. Either a photograph is being made, an audiotape is being made, or a videotape is being made, especially every moment of her life that she has been sharing with her mother.

Ms. Warden confirms that after it was apparent that the sexual abuse against the father could not be established, that the questions turned to the father. The father's private life. The father's plans for his time with the child to which Patsy Fletcher, the maternal grandmother, addressed. Tell them where you don't want to go, child. Tell them, or I'll start crying.

Ms. Warden testified that she, a grown woman, went home every day stressed. She finally came to think that what the child was being put through, that she observed, at the Fletcher household is abuse. And that on the day before the child was to go to Florida on a vacation with her father, she, Ms. Warden, begged the mother not to questions this child. Begged. Begged.

Nothing's changed. Except one would think that if one's not granted custody of their own child because the Court found in June of 1999 the mother was doing these things, and for these reasons, the mother does not get custody, that the mother would stop. One would think. If those are the reasons I lost custody, goodness forbid, I won't do this. Not if you really want custody. Of course, if you want to slander the father, carry on. If you want to put the father in disrepute, carry on. If you want everyone you come in contact with to think that he is illegally touching his child, carry on. But if you don't want to mistreat the child who you already think is being mistreated because the Court finds that in the process of trying to save her, you're causing her damage, you stop that. It hasn't stopped. New

audience. Nothing's changed, except what the mother was doing flies in the face of the Order the Court made June 25th, 1999. Ah, well, you didn't like this, well, we're just going to carry on.

I gave you access to this baby, and, now, for another year, she has been exposed to everyone who comes in contact with her. She thinks her genitals are the height of her being. Something to be admired, I guess. I think the Court made a mistake counting on the mother to focus on her relationship with her child. That's what I thought I was doing. I made a mistake. And I really wish I could explain to this child that I did not intend for her to be further exposed and photographed and taped and videoed and questioned. I thought her mother and her mother's family had more good things, desirable activities, in mind for her.

Every time a Court makes a decision for a defenseless entity, we run the risk of exposing them to more harm. Now, I have a guardian ad litem telling me that this child needs be seen by a mental health professional, and I don't doubt it. And I also don't doubt - - although I've never been anxious, I don't doubt that the mother should not have visitation unless it is supervised by an independent third-party entity like the Department of Human Services which most assuredly would not let the child suffer any other harm. And although I'm aware that the Department of Human Services or Children's Services doesn't have an abundance of workers, and this may result in the restriction of the mother's access to the child, the mother has left me no choice. And this Motion is granted.

The findings of the trial court as to the bizarre behavior of Mother, both before the June 24, 1999 hearing and during the interim between June 24, 1999 and the August 10, 2000 hearing, not only have ample evidentiary support in the testimonial record but, in fact, are practically undisputed by Mother. The testimony supporting the continuation, after June 29, 1999, of Mother's inquisition of this three to four-year-old child about alleged sexual abuse by Father comes primarily from Kelly Beauchane and Kathy Warden. These witnesses are the very persons authorized by the trial court following the June 24, 1999 hearing to monitor and supervise the visitation between Mother and the minor child.

Based upon these extensive findings of fact following the August 10, 2000 hearing, the Order of the trial court of October 4, 2000 provided in decretal part:

> 2. As to Husband's *Emergency Motion to Suspend Visitation Between the Wife and Minor Child, or in the Alternative, Strictly Limit Visitation Between the Wife and Minor Child*, the Court finds the motion is well taken and orders that visitation between the Wife and Minor Child be terminated until such time as a supervisor by an independent third-party entity; or a supervisor who works for the Department of Human Services, or a health care professional who deals with child-abuse situations is in place and feels comfortable in

-13-

terminating the visitation, to take the Minor Child into their custody to protect the Minor Child and be responsible for the Minor Child.

3. The Guardian Ad Litem, Jerry Hamlin may consent to the supervising entity and if he is willing to take that responsibility, then his approval would satisfy the requirement of the Court.

4. That at a point in time when supervised visitation between the Wife and the Minor Child has been properly established, as referenced in Paragraph 2 above, said supervised visitation must take place somewhere other than the home of Pat Fletcher.

5. That telephone visitation between the Wife and the Minor Child is suspended pending further Orders of this Court.

6. That the Wife is allowed unlimited written communication with the Minor Child so long as the Wife refrains from negative phrases, which might hurt the Minor Child, such as "I miss you", which this Court deems a negative.

On March 28, 2001, the Final Decree of Divorce was entered and provided, in pertinent part:

It is further ORDERED, ADJUDGED and DECREED that all child-related issues pertaining to the parties' minor child, [V.M.S.] (d.o.b. 10-17-95), should be and are hereby contained in the Final Parenting Plan executed by the parties on the 22nd day of March, 2001, to which reference is hereby specifically made and which is incorporated hereto by reference the same as if set out verbatim herein.

. . . .

It is further ORDERED, ADJUDGED and DECREED that this Final Decree of Divorce and Final Parenting Plan supercede any *pendente lite* Orders in this cause.

The parenting plan incorporated in the Final Decree of Divorce provided, in pertinent part:

1. All visitation to be supervised by Teresa McWilliams, Robert or Faye Carroll, or other supervisors as the parties may agree.
2. Mother shall be restrained and enjoined from questioning the minor child about sexual matters or about the Father's activities and/or audio and videotaping the same.
3. Mother shall be restrained and enjoined from taking or allowing anyone to take nude photos or videos of the minor child.
4. Mother shall be restrained and enjoined from subjecting the child to any gynecological exams or taking her to routine physical exams. In the event of a medical emergency, the Mother shall notify the Father immediately.
5. Good byes at the end of the Mother's residential time shall be limited to five (5) minutes.

-14-

6. The Mother shall be permitted to attend reasonable school events, lunch at school once a week, and extracurricular activities of the child, with a supervisor.

7. The Mother shall not take the minor child out of the state without the express permission of the Father.

8. The parties shall participate in mediation within thirty (30) days for purposes of determining enhanced residential time and lessened restrictions for the Mother, based upon the passing of time and the conduct of the parties; to determine possession of the child's furniture, clothing and accessories now in the possession of the Father; to determine child support, if any, paid to the Father and the amount thereof; and during which mediation the Mother shall tell the Father where she and the child went when they were gone in the summer of 1999.

9. All other, prior restrictions on *pendente lite* visitation not reiterated specifically herein, are hereby dissolved, including particularly the restriction against visitation at the Fletcher's homes and the time limits on supervision by McWilliams and the Carrolls.

10. The Father shall be permitted to communicate with the supervisors.

On December 7, 2001, Mother filed her Petition to Modify Parenting Plan asserting that efforts at mediation relative to less restrictions and enhanced residential time for the Mother had failed. On January 28, 2002, Father filed an Answer and Counter-Petition asserting that Mother had failed to set forth a substantial and material change of circumstances and was continuing her previous course of conduct relative to the minor child. In his Counter Petition, he sought child support from Mother. Subsequent pleadings and motions resulted in an Agreed Order of April 24, 2002, providing specific spring holiday visitation for Mother, provided same was supervised by the court appointed supervisors. On June 26, 2002, the court heard the issues presented by the Petition to Modify Parenting Plan and the Counter-Petition filed by Father. Following that hearing, the court held, in pertinent part:

21. The Court finds that it is proper for the Court to make the areas left blank in the Permanent Parenting Plan compatible with the Permanent Parenting Plan agreed to between the parties.

22. The Court finds that no overnights were provided for the Mother in the Permanent Parenting Plan. Further, the Court finds that the Permanent Parenting Plan required all of the Mother's time with the child to be supervised.

23. The Court finds that it is quite clear from the Permanent Parenting Plan that it has been a problem for the child to be questioned by the Mother about sexual matters, have nude photos made and videos made of the child's private person, to be taken to gynecological examinations, and that it is not in the child's best interests to be subjected to this kind of conduct by the Mother.

24. Further, the Court finds that the Mother does not seem to understand that some things that she says or does may hurt this child. The Court finds that the Mother believes that she has not hurt this child. The Court finds that the Mother acted inappropriately when she told the minor child that the Mother is very ill; when

she told the minor child that the minor child would be coming home to live with the Mother soon; and when she calls the child by the Mother's maiden name.

25. The testimony reflects that the Mother is not sensitive enough to what the child might feel or be unable to handle emotionally at six years of age.

26. The Mother has to be supervised even when she attends public events, which indicates that because of the Mother's prior absconding with the child, that it is feared that the Mother will abscond with the child again.

27. That the Mother cannot remove the child from the state, so that she might not secret the child with the permission of the Father is another precaution against the mother absconding with the child.

28. Under the original Permanent Parenting Plan the Father is allowed to communicate with the supervisors so that he may make sure that everything that the Mother is not supposed to do is not being done.

29. Based upon the foregoing, the Court finds that the Father's Proposed Parenting Plan is more compatible with the spirit of the original Permanent Parenting Plan, and the Court hereby approves and adopts same.

In the decretal portion of the Order, it was provided, in pertinent part:

1. Attached hereto as Exhibit A and incorporated herein by reference is an excerpt from the transcript and the Court's Ruling as a result of the hearing of this matter on the 26th day of June, 2002.

2. That the Permanent Parenting Plan entered in this cause on the 28th day of March, 2001 is hereby modified as set forth in the Father's Proposed Parenting Plan filed in this cause; and that the Permanent Parenting Plan reflecting said changes and filed herewith is approved, accepted and made the Order of this Honorable Court.

The Parenting Plan adopted as a part of this Order left visitation for the Mother essentially the same as in the previous Parenting Plan in the Final Decree of Divorce, with some expansion of such visitation for holidays but with essentially the same provisions for supervisors of such visitations.

The Order following the June 26, 2002 hearing was entered on November 20, 2002 and, on December 19, 2002, Laurie Ann Searcy filed a timely Notice of Appeal.

Issues on appeal: "I. Whether the trial court erred in failing to award Mother relief pursuant to paragraph 8 of the Addendum to the Parenting Plan. II. Whether the trial court's judgment must be reversed because the court utilized the wrong legal standard applicable to a modification of a Parenting Plan."

Since it is clear that the trial court utilized a variation of the *Musselman-Wall* standard rather than the presently effective *Cranston v. Combs* standard in determining whether or not a change of circumstances occurred, the sole remaining question before this Court is whether or not the record

shows a change of circumstances within the standard of *Cranston v. Combs*. If no change of circumstances has occurred under this standard, the judgment of the trial court must be affirmed. If a change of circumstances has occurred under this standard, then this Court must address the second part of the *Cranston v. Combs*' test, which is a comparative fitness test.

The testimonial record in this case indicates that little or no change has occurred in the period between the Final Divorce Decree of March 28, 2001, and the final Order of the court denying the Petition to Modify Parenting Plan on November 20, 2002.

The most persuasive testimony as to there being no change of circumstances is the testimony of Mother herself. She makes it clear that she feels that her separation from her child has been brought about solely through the acts of Father and that she bears no responsibility. She has refrained from further investigation of her sexual abuse charges because of the specific orders of the court, but she repeatedly insists on telling the child that she will be coming back to live with Mother. Specifically, she says:

> Q. Ms. Searcy, have you told your daughter that she would be back living with you soon?
> A. Yes, and I hope she will.
> Q. And you caused her to actually expect that by repeating that so often, haven't you?
> A. Well, me and my daughter have a lot of faith in God, and sooner or later - -
> Q. Have you encouraged that by repeating it?
> A. Why shouldn't I encourage my daughter that she'll never be at home and I'll never be with her?
> Q. But you told your daughter that she's going to be coming to live with you soon; is that right?
> A. One of these days, I hope so. And that's what I say - - I hope so.

She also embarked upon a further course of telling the child that her name was Fletcher instead of Searcy, Fletcher being the Mother's maiden name.

While the trial court verbalized the wrong standard in determining whether or not a change of circumstances has occurred, the record of the June 26, 2002 hearing, and particularly the testimony of Mother, indicates that, at best, with the exception of the discontinuence of the sexual abuse charges, there has been no change in her conduct, which is, after all, the sole cause of her restricted access to her child.

*Cranston v. Combs* provides:

> First, the court must determine whether a material change in circumstances has occurred after the initial custody determination. Although there are no bright-line

rules for determining when such a change has occurred, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston*, 106 S.W.2d at 644. Whatever change of circumstances may have occurred in this case, is certainly not a change that "affects the child's well-being in a meaningful way."

The second provision of the *Cranston v. Combs*' standard involving a comparative fitness test is not triggered unless a change of circumstances is first found to have occurred. No such change is evidenced in this case.

The judgment of the trial court is in all respects affirmed under the standards set forth in *Cranston v. Combs*. Costs of this cause are assessed to Appellant, and the case is remanded to the trial court for such further proceedings as may be necessary.

_____
WILLIAM B. CAIN, JUDGE